UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ML & UK PALM LLC,

Appellant,

- against -

**MEMORANDUM & ORDER**
25-CV-5016 (PKC)

WILMINGTON TRUST NATIONAL ASSOCIATION,

Appellee.
-----------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

Debtor ML & UK Palm LLC ("ML" or "Appellant") appeals an order entered by the United States Bankruptcy Court for the Eastern District of New York (Mazer-Marino, *Bankr. J.*), rejecting ML's objections to a claim filed by its creditor, Wilmington Trust National Association ("Wilmington" or "Appellee"). For the reasons set forth herein, the Court affirms the judgment of the Bankruptcy Court.

## BACKGROUND

### I. Factual Background[1]

At the time ML filed for bankruptcy in August 2022, it owned the Willowdaile Shopping Center in Durham, North Carolina ("the Property"). (*See* B.R. 159.) Previously, on September 17, 2018, ML had entered into a "Loan Agreement" with Rialto Mortgage Finance, LLC ("Rialto") for $6,800,000 (the "Loan"), which was secured by the "real property, leases and rents . . . and

[1] The following facts are derived from the bankruptcy record provided on appeal. Citations to "B.R." refer to the Bankruptcy Record on Appeal, submitted pursuant to Fed. R. Bankr. P. 8009 and filed at Dkt. 4. The page numbers for these citations refer to those found in the bottom right corner of each page of the B.R. Citations to "A-" refer to the Appendix, filed by ML at Dkt. 17-1, pursuant to Fed. R. Bankr. P. 8018. The page numbers for citations to "A-" may be found on the top right corner of each page of the Appendix.

personal property collateral" associated with the Property. (B.R. 20; *see also* Note, Dkt. 37-1, at ECF[2] 142.) The Loan Agreement provided, *inter alia*, that ML was to make "Monthly Debt Service Payments" to Rialto and request Rialto's approval for renewals, modifications, and amendments to leases of the tenants of the Property. (Loan Agreement, Dkt. 37-1, at ECF 9, 18, 30, 45.) If a "Cash Management Trigger Event" occurred—such as a default or any bankruptcy action by ML—Rialto was authorized "to open and activate [a] Clearing Account" with a bank on ML's behalf. (*Id.* at ECF 12, 62.) All rents from the Property would subsequently be deposited into the Clearing Account. (*Id.* at ECF 62.) In turn, "on each [b]usiness [d]ay," the funds deposited into the Clearing Account would be transferred to a "Cash Management Account," an "account under [Rialto]'s sole dominion and control." (*Id.* at ECF 64.)

**A. Assignment and Defaults**

In 2018, Rialto assigned all of its "right[s], title, and interest" in the Loan Documents to Wilmington. (B.R. 22; Assignment, Dkt. 37-1, at ECF 189, 194.) On June 5, 2020, ML and Wilmington entered a "Modification Agreement" to address ML's failure to make timely monthly payments, but ML's default remained uncured. (*See* B.R. 22, 159–60.) On December 28, 2021, Wilmington notified ML that it was in default, and, as a result, Wilmington would accelerate the Loan and demand payment in full. (B.R. 23, 122–23.) And in May 2022, Wilmington sought to foreclose on the Property through proceedings initiated in North Carolina. (B.R. 160.)

**B. The Reinstatement Agreement**

After Wilmington commenced a foreclosure action, Wilmington and ML entered into a Reinstatement Agreement, effective June 21, 2022. (B.R. 20, 161.) The Parties agreed that ML's

[2] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

"obligations under the Loan are governed by the Loan Agreement," and that, due to ML's prior defaults, "[t]he amounts now due and owing under the Loan Documents"[3] included, *inter alia*, "the full accelerated principal balance, accrued but unpaid interest including at the Default Rate, late payment charges, Yield Maintenance Default Premium, special servicing fees, [and] interest on advances." (B.R. 20, 22.) However, the Reinstatement Agreement provided that the Loan would no longer be accelerated if ML "satisf[ied]" certain conditions "not later than the Effective Date [*i.e.*, June 21, 2022], each being a condition precedent to [Wilmington's] obligations under [the Reinstatement] Agreement." (B.R. 25.) Relevant here, ML was required to pay Wilmington $795,088.70 by the Effective Date (the "Reinstatement Payment"). (B.R. 25, 39.)

The Reinstatement Agreement also imposed other new conditions on ML. *First*, ML was required to "provide[] Tenant Instruction Notices as required by Section 6.1.2 of the Loan Agreement directing remittance of all Rents into the Clearing Account not later than five (5) business days after the Effective Date." (B.R. 25–26.) Section 6.1.2 of the Loan Agreement, *inter alia*, required ML to deliver to each tenant of the Property instructions on how to remit rents into the Clearing Account. (*See* Loan Agreement, Dkt. 37-1, at ECF 62–63.) *Second*, ML was required to "confirm and provide written confirmation to [Wilmington] that all Rents [were] actually being deposited into the Clearing Account not later than forty-five (45) days after the Effective Date." (B.R. 26.) *Third*, "[i]mmediately upon the Effective Date," ML was to "remit all Rents on hand for deposit into the Clearing Account." (B.R. 26.) ML's failure to satisfy any of these conditions "in a timely manner [would] result[] in an Event of Default under the Loan Documents without further notice or demand." (B.R. 25.)

---

[3] The Agreement defined "Loan Documents" as including, *inter alia*, "[t]he Note, Loan Agreement, Cash Management Agreement, [Deposit Account Control Agreement]," and the "Modification Agreement." (B.R. 21–22.)

In the "Payments After Effective Date" section of the Reinstatement Agreement, ML assumed the obligation to "make all [Monthly Debt Service P]ayments due on each Payment Date as provided under the Loan Documents beginning on July 6, 2022, and all Payment Dates thereafter." (B.R. 26.)

The Reinstatement Agreement further provided that the "definition of an Event of Default, as provided in Section 7.1 of the Loan Agreement, and as applicable to this Agreement, is hereby supplemented to include . . . a failure to comply with any term of this Agreement after any applicable grace period . . . if any." (B.R. 28.) Section 7.1 of the Loan Agreement defined "Event of Default" as occurring, *inter alia*, where "any portion of the Debt is not paid on or before the date the same is due and payable or if the entire Debt is not paid on or before the Maturity Date."[4] (Loan Agreement, Dkt. 37-1, at ECF 71.) The Reinstatement Agreement further provided that Wilmington would "require strict compliance with the terms set forth herein." (B.R. 31.)

The Reinstatement Agreement concluded that the "Loan Documents . . . shall continue in full force and effect and constitute the legal, valid, and binding obligations of the Borrower Parties [(ML and the guarantor, Meyer Lebovitz)] enforceable in accordance with the terms stated therein, subject to the reinstatement of the Loan as provided in this Agreement." (B.R. 29; *see also* B.R. 20 (defining "Borrower Parties").) In the "Other Terms and Conditions Unchanged" Section, the Reinstatement Agreement added, "[a]ll other terms and conditions of the Loan Documents not expressly modified by this Agreement shall remain in full force and effect. This Agreement shall be a Loan Document which shall alter the terms of the Loan Documents executed at origination of the Loan only to the extent expressly provided herein and strictly limited to the times specified in this Agreement." (B.R. 30.)

[4] The "Maturity Date" is October 6, 2028. (Loan Agreement, Dkt. 37-1, at ECF 9, 23.)

### C. ML's Alleged Breaches of the Reinstatement Agreement

ML failed to pay the full Reinstatement Payment of $795,088.70 by the Effective Date of June 21, 2022, and instead only paid $649,000. (B.R. 42, 44–45.) Accordingly, on June 24, 2022, Wilmington sent a letter to ML informing it that "the Loan remains accelerated and is due and payable in full." (B.R. 41–42.) Wilmington "reserve[d] the right to apply the [$649,000] in a manner determined by [Wilmington] in its sole discretion" and that nothing should be construed as a "waiver of any rights" and remedies on the Loan. (B.R. 42–43.) However, by June 29, 2022, ML paid the full $795,088.70. (B.R. 45.) Notwithstanding ML's failure to make a timely Reinstatement Payment, Wilmington indicated it was "willing to go forward with reinstatement of the Loan as provided in the Reinstatement Agreement." (*Id.*) Wilmington explained that it "intend[ed] to enforce the terms of the Loan Documents including the Reinstatement Agreement in strict accordance with the express terms thereof in all respects including a requirement that [ML] meet the obligations thereunder in a timely manner." (*Id.*)

On July 14, 2022, Wilmington sent a "Notice of Default" to ML explaining that, upon information and belief, ML had failed to provide "Tenant Instruction Notices within five (5) business days after the Effective Date and (2) remit all net Rents to [Wilmington] immediately upon the Effective Date." (B.R. 47–48.) The notice further indicated that although Wilmington had "demanded that [ML] provide proof" that such notices were sent, ML "failed and/or refused to do so as of the date hereof." (B.R. 48.) Moreover, Wilmington explained, "funds have finally been received into the Cash Management Account in a cumulative amount sufficient to cover the amounts due on the July 6, 2022, Payment Date." (*See id.*) In other words, ML's Monthly Debt Service Payment was over one week late. (*See id.*) Wilmington explained that it would apply the amount paid to ML's debt, but that ML's delay "constitutes an Event of Default." (*See id.*) Finally, Wilmington requested that ML send, by July 21, 2022, operating statements for the Property for

2019, 2020, and 2022, as well as a "[r]ent roll as of June 2022" ("Financial Reporting"), pursuant to a provision in the Loan Agreement. (*Id.*)

Wilmington sent another "Notice of Default" to ML on August 4, 2022. (B.R. 50.) In the notice, Wilmington identified five "Events of Default" that had occurred:

> (1) ML failed to pay $795,088.70 by June 21, 2022.
>
> (2) ML failed to provide "Tenant Instruction Notices" within five business days of the Effective Date. ML had "provided information to indicate that [such] Notices were sent to tenants on or about July 29, 2022." ML also failed to remit rents to the Clearing Account within one business day of receipt.
>
> (3) ML failed to make the Monthly Debt Service Payment, due July 6, 2022, in a timely manner. "Sufficient funds had not been collected in the Clearing Account until July 14, 2022."
>
> (4) ML failed to send, by July 21, 2022, the requested Financial Reporting. ML instead sent the Financial Reporting on July 29, 2022.
>
> (5) ML entered into a lease amendment in April 2022 with Taste of China Inc. d/b/a Dragon Inn without seeking Wilmington's approval ("Dragon Lease amendment").

(B.R. 51–52.) Wilmington reminded ML that, under Section 6.1.6 of the Loan Agreement, the "insufficiency of funds on deposit in the Clearing Account and/or Cash Management Account shall not relieve [ML] from the obligation to make any payments, as and when due pursuant to [the Loan] Agreement, the Note and the other Loan Documents." (Loan Agreement., Dkt. 37-1, at ECF 65; *see also* B.R. 51 (referencing this provision of the Loan Agreement in the August 4, 2022 letter).) Moreover, that Section of the Loan Agreement set out that this obligation was "separate and independent, and not conditioned on any event or circumstances whatsoever." (Loan Agreement., Dkt. 37-1, at ECF 65; *see also* B.R. 48 (referencing this provision in the July 14, 2022 letter).)

By August 12, 2022, Wilmington informed ML that two additional "Events of Default" had occurred. (B.R. 55–56.) ML had failed to make the requisite Monthly Debt Service Payment,

which was due August 6, 2022, (*see* B.R. 56 (noting that "sufficient funds were not collected through the Clearing Account to satisfy the amounts due on August 6, 2022")), and ML had failed to confirm that rents were being deposited into the Clearing Account, (*id.*).

## II. Relevant Procedural History

On August 12, 2022, ML filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. (A-9.) In September 2024, Wilmington filed a secured claim ("Claim") in the amount of $7,961,748.07, reflecting $6,329,676.61 in outstanding principal, $809,553.33 in Default Interest Receivable, and other fees and advances. (A-1, A-5.)

On April 9, 2025, ML filed an objection to Wilmington's Claim (the "Claim Objection"). (A-8, A-14.) ML argued that it was not in default of the Reinstatement Agreement, and therefore the amount of default interest it owed to Wilmington must be reduced. (*See* A-13; B.R. 9; *see also* 07/23/2026 Hr'g Tr., Dkt. 37-2, at 10–11 (clarifying that the dispute was "whether there was a default, which would then give rise to certain default interest rates, and other charges and fees assessed and computed as part of Wilmington's proof of claim").)[5] Although ML admitted that it did not timely pay the Reinstatement Payment, it failed to provide notices to tenants to remit funds, failed to remit rents to the Clearing Account, failed to make timely Monthly Debt Service Payments on July 6, 2022 and August 6, 2022, and entered into a lease amendment without approval, (A-126–30 (Wilmington alleging these defaults by ML); A-163–67 (ML not contesting this conduct)), it argued that these events did not constitute defaults under the Reinstatement

[5] ML raised other objections that are not the subject of the appeal. (*See* B.R. 9 (arguing that Wilmington's Claim failed to account for payments it received, including "$795,088.70 in June 2022, . . . . $600,000 on May 20, 2024[,]" and "payments made by [ML] to Wilmington during the Chapter 11 Case in the amount of $193,688.70").)

Agreement, and therefore Wilmington's Claim improperly continued to accrue default interest, (*see* A-13, A-165–67).

On August 20, 2025, Bankruptcy Court Judge Mazer-Marino denied ML's Claim Objection "for the reasons set forth by the Court on the record at the July 23, 2025 hearing." (A-193.) At the July 23, 2025 hearing, Judge Mazer-Marino determined that ML did not default under the Reinstatement Agreement by failing to timely pay the Reinstatement Payment because this payment was "a condition precedent to the effectiveness of the [R]einstatement [A]greement." (*See* 07/23/2025 Hr'g Tr., Dkt. 37-2, at 15–16, 19.) Nonetheless, Judge Mazer-Marino found the Reinstatement Agreement to be effective because Wilmington "accept[ed] the . . . [Reinstatement P]ayment." (*Id.* at 24.) Judge Mazer-Marino then found that ML "defaulted under the [R]einstatement [A]greement by failing to timely make the July, August, and September [Monthly Debt Service P]ayments, . . . by failing to provide proof that the tenant notices were sent out, and by failing to obtain the approval of the Dragon [L]ease amendment." (*Id.*) Judge Mazer-Marino additionally found irrelevant the fact that ML had experienced difficulty placing funds in the Clearing Account because even "assuming [ML] collected every last nickel of rent, put it into the [Clearing A]ccount, and the amounts were short to make the payment that was due, [ML] would have had to have supplemented that payment to make sure that the monthly payments under the [R]einstatement [A]greement were paid in full." (*Id.* at 25.)

ML timely appealed on September 8, 2025. (Dkt. 1.) The appeal was fully briefed on May 4, 2026.[6] However, on June 12, 2026, Wilmington moved to dismiss ML's appeal, advancing a mootness argument not raised in its opposition to ML's appeal. (Dkt. 20.) The Court accordingly

---

[6] (*See* Appellant's Br., Dkt. 17; Appellee's Br., Dkt. 18; Appellant's Reply Br., Dkt. 19.)

set a separate briefing schedule for that motion. (06/16/2026 Dkt. Order.) That briefing was completed on July 27, 2026.[7]

## STANDARD OF REVIEW

District courts have appellate jurisdiction over "final judgments, orders, and decrees" entered in bankruptcy court. 28 U.S.C. § 158(a). An order declining to reduce a claim is a final, appealable order. *See In re Residential Cap., LLC*, No. 15-CV-8340 (PKC), 2016 WL 4082712, at *1 (S.D.N.Y. July 28, 2016) (reviewing bankruptcy court order sustaining objection to proof of claim). The Court reviews the Bankruptcy Court's findings of fact for clear error, and its conclusions of law *de novo*. *See In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 103 (2d Cir. 2000).

## DISCUSSION

The Court finds that ML forfeited any argument that it did not default under the Reinstatement Agreement by failing to make timely Monthly Debt Service Payments to Wilmington. Accordingly, the judgment of the Bankruptcy Court is affirmed.[8]

---

[7] (*See* Appellee's Mot. Dismiss Appeal, Dkt. 27; Appellee's Mem. Supp. Mot. Dismiss Appeal ("MTD"), Dkt. 28; Decl. of Matt Contreras Supp. MTD ("Contreras Decl."), Dkt. 29; Appellant's Mem. Opp'n MTD ("Opp'n"), Dkt. 26; Appellee's Reply Supp. MTD ("MTD Reply"), Dkt. 31.)

[8] The Court does not determine whether this appeal is moot because either conclusion would result in the affirmance of the Bankruptcy Court's judgment. *See Squires Motel, LLC v. Gance*, 426 B.R. 29, 34, 36 (N.D.N.Y. 2010) (affirming judgment of the bankruptcy court upon dismissing appeal as moot); *Daskal v. 1584 Fulton, LLC*, No. 14-CV-7402 (KAM), 2015 WL 6442338, at *8 (E.D.N.Y. Oct. 23, 2015) (same); *see also In re Dunia*, No. 20-CV-7484 (KPF), 2021 WL 1700194, at *2 n.2 (S.D.N.Y. Apr. 29, 2021) (concluding that, even if an appeal was not moot, the "Bankruptcy Court's order must be affirmed"); *In re Kajla*, No. BR 3 8-22208 (CMG), 2019 WL 6339860, at *2 n.6 (D.N.J. Nov. 27, 2019) (declining to decide appeal was moot because "the Court finds the Bankruptcy Court's decision must be affirmed"). Accordingly, the Court denies Appellant's Motion for Leave to File a Sur-Reply, (Dkt. 34), as moot.

## I. ML Forfeited the Argument that It Did Not Default Under the Reinstatement Agreement by Failing to Make Timely Monthly Debt Service Payments.

"Arguments raised for the first time on appeal are deemed [forfeited]." *Millea v. Metro–North R.R. Co.*, 658 F.3d 154, 163 (2d Cir. 2011); *Red Tree Invs., LLC v. Petroleos de Venez., S.A.*, 82 F.4th 161, 174 (2d Cir. 2023); *see In re Schick*, No. 96 B 42902 (SMB), 1998 WL 397849, at *7 (S.D.N.Y. July 16, 1998) (applying this principle to appeals from the bankruptcy court).[9] "[A] 'single, conclusory, one-sentence argument' is insufficient to raise an issue in the first instance." *Grytsyk v. Morales*, 527 F. Supp. 3d 639, 651 (S.D.N.Y. 2021) (alteration in original) (quoting *SOHC, Inc. v. Zentis Food Sols. N. Am., LLC*, No. 14-CV-2270 (JMF), 2014 WL 6603951, at *1 (S.D.N.Y. Nov. 20, 2014)). In other words, the party must offer "*some* argument or development of its theory" below to pursue it on appeal. *See United States v. Griffiths*, 47 F.3d 74, 77 (2d Cir. 1995) (finding litigant forfeited argument by "merely incant[ing] the phrase 'search incident to arrest'" before trial court); *see also United States v. Tonawanda Coke Corp.*, 636 F. App'x 24, 27 (2d Cir. 2016) (summary order) (rejecting a party's "passing remark, devoid of explanation" as preserving issue for appeal).

ML failed to preserve its challenges to the Bankruptcy Court's finding that it had defaulted under the Reinstatement Agreement by failing to timely remit Monthly Debt Service Payments. First, ML never argued before the Bankruptcy Court, as it does now, that Wilmington had waived

[9] Although caselaw discussing this principle refers to it interchangeably as "waiver" and "forfeiture," "forfeiture is the failure to make the timely assertion of a right," whereas "waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993). For the reasons explained below, the Court views ML's conduct as "forfeiting" an argument related to its breach of the Reinstatement Agreement. The Court notes that although the Parties discuss Wilmington's purported "waiver" as to ML's late Reinstatement Payment, *see infra*, the "waiver" they discuss does not concern preserving arguments for appeal and instead concerns waiver doctrine under North Carolina law, which is the knowing relinquishment of a contractual right. (*See* Appellant's Br., Dkt. 17, at 21–22; Appellee's Br., Dkt. 18, at 21–23.)

ML's untimely Monthly Debt Service Payments. (*See* Appellant's Br., Dkt. 17, at 26–28.)[10] ML only asserted that Wilmington waived the "late [R]einstatement [P]ayment." (B.R. 161–62, 178.) To that end—and tellingly—the Bankruptcy Court only addressed Wilmington's waiver of the late Reinstatement Payment, and did not address waiver as it pertained to ML's Monthly Debt Service Payments. (07/23/2025 Hr'g Tr., Dkt. 37-2, at 15–16, 19–25.) Accordingly, ML has forfeited any argument that Wilmington waived its right to claim default based on untimely monthly payments. *See Grytsyk*, 527 F. Supp. 3d at 651 (finding defendants forfeited argument that there was probable cause to arrest the plaintiff for disorderly conduct because defendants only advanced that argument as to arresting plaintiff for a "*different* crime").

Second, ML failed to preserve its argument that ML's delayed Monthly Debt Service Payments did not constitute a breach under the doctrine of prevention. (Appellant's Br., Dkt. 17, at 16–20.) Although ML did assert in its opening brief before the Bankruptcy Court that Wilmington had "caused" ML's delayed deposits into the Clearing Account, ML only argued the "doctrines of impossibility of performance and frustration of purpose"—*not prevention*—as excusing ML's "failure to [timely] fund" the Clearing Account. (B.R. 162.)[11] Notably, in

[10] The waiver argument ML raises on appeal is different from the non-performance argument ML made below. (*Compare* B.R. 178 ("The lockbox delay was caused by lender's agent and excuses performance"), *with* Appellant's Br., Dkt. 17, at 27 ("Lender's 'acts and conduct' in failing to open a Clearing Account show its intent to temporarily waive its right to require timely monthly payments.").) As Appellant acknowledges, waiver and excuse are different legal theories. *See* Appellant's Br., Dkt. 17, at 16 ("In general, '[n]on-performance of a valid contract is a breach thereof . . . unless the person charged . . . shows some valid reason which may excuse the non-performance; and the burden of doing so rests upon him.'" (alteration in original) (citation omitted)); *see also id.* at 17 ("Waiver is defined as 'an intentional relinquishment of a known right.'" (citation omitted)).

[11] ML mentioned, in passing, that "[w]hen performance is hindered by the other party's failure to facilitate a required condition, nonperformance is excused." (B.R. 162.) However, even assuming this sentence referenced the doctrine of prevention—a conclusion the Court cannot reach in light of ML's discussion of impossibility of performance and frustration of purpose—ML's oblique reference to it, in passing, fails to preserve it for review on appeal. *See Nambiar v. Cent.*

advancing this argument, ML made no mention of its delayed Monthly Debt Service Payments, and instead focused on its failure to deposit *rents* into the Account. (*See* B.R. 161–62.) Only in its sur-reply did ML allude to the doctrine of prevention—although it cited to no caselaw concerning that doctrine. (*See* B.R. 178 ("Performance may be excused under the doctrine of impossibility or *when the obligor is prevented by the obligee's own conduct.*" (emphasis added) (quoting *Brenner v. Little Red School House, Ltd.*, 302 N.C. 207 (1981))); *Brenner*, 302 N.C. at 209–14 (discussing impossibility of performance and frustration of purpose, but not prevention). And in that sur-reply, ML failed to explicitly mention the delayed Monthly Debt Service Payments, and instead vaguely asserted—without any supportive citations—that the "Reinstatement Agreement expressly contemplated use of the lockbox as the mechanism for clearing rents and *making payments*." (B.R. 178 (emphasis added)); *see supra* n.11 (explaining oblique and passing reference to a legal issue is insufficient to preserve an issue for an appeal). Simply put, before the Bankruptcy Court, ML failed to advance any non-conclusory, developed argument as to Wilmington's purported "prevention" of ML's ability to make the required Monthly Debt Service Payments. It is no surprise, then, that Judge Mazer-Marino found that the sur-reply "doesn't add too much to the argument." (07/23/2025 Hr'g Tr., Dkt. 37-2, at 23.) Because ML raises this argument for the first time on appeal, it is forfeited.

The Court has "discretion to consider arguments [forfeited] below because [the forfeiture] doctrine is entirely prudential." *See United States v. Gomez*, 877 F.3d 76, 95 (2d Cir. 2017) (quoting *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008) (per curiam)).

---

*Orthopedic Grp., LLP*, 158 F.4th 349, 362 (2d Cir. 2025) (determining that vague objections to an R&R did not preserve issue for appeal because "[m]entioning an issue only 'obliquely and in passing' is insufficient to preserve it for review" (quoting *Gerstenbluth v. Credit Suisse Sec. (USA) LLC*, 728 F.3d 139, 142 n.4 (2d Cir. 2013))).

Courts may exercise this discretion "where necessary to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding." *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006). The Court declines to exercise its discretion here, because the Parties' briefing is so deficient as to prevent any good-faith assessment of the merits of this appeal. For example, although the Parties' appeal turns on the interpretation of the Reinstatement Agreement under North Carolina law,[12] neither party addresses the relevant standard for such analysis—including, for example, how the Court should address ambiguities in the Reinstatement Agreement, if it were to find any. Nor does either Party engage meaningfully with terms in the Loan Agreement or the Reinstatement Agreement that appear to distinguish between different payment channels and the circumstances under which they are to be used. (*Compare* Loan Agreement, Dkt. 37-1, at ECF 29–31 (discussing monthly payments on the Loan without specifying mechanism for making such payments), *with id.* at ECF 62 (discussing payments made to the Clearing Account "[u]pon the occurrence of a Cash Management Trigger Event"); *id.* at ECF 12 (outlining the specific events that constitute a "Cash Management Trigger Event"); *see also* Appellant's Br., Dkt. 18, at 10, 20–21 (arguing that ML had the "obligation to make a timely monthly payment . . . , whether by certified check, wire transfer or other method of payment" but not explaining how paying by alternative means than the Clearing Account was "expressly contemplated by the Loan Documents").)

[12] Neither party contests the factual findings of the Bankruptcy Court, and thus they only challenge the Bankruptcy Court's interpretation of the Reinstatement Agreement under relevant contract law. (*See generally* Appellant's Br., Dkt. 17; Appellee's Br., Dkt. 18.) The Reinstatement Agreement contains a controlling law provision which provides that "the validity, interpretation, enforcement and effect of the Loan Documents shall be governed by, and construed in accordance with, the laws of the state in which the property is located." (B.R. 35.) The Property is located in North Carolina, (B.R. 5), and both Parties seem to agree that North Carolina law governs the interpretation of the underlying contracts at hand—although both Parties' briefs contain strikingly scant caselaw to that effect, (*see* Appellant's Br., Dkt. 17, at 14; Appellee's Br., Dkt. 18, at 21).

While the Court, as always, aims to resolve issues on their merits, this dearth of relevant briefing and analysis renders the Court unable to do so. The Court notes that despite having grounds to dismiss this appeal because both Parties were noncompliant with the Bankruptcy Rules of Procedure, the Court refrained from doing so. (*See* 08/05/2026 Dkt. Order (documenting the Parties' noncompliance and the Court's authority to dismiss the appeal on this basis, but declining to do so because "both [P]arties have been noncompliant . . . , and because of the interest in resolving cases on their merits").) However, "it is not the obligation of this Court to research and construct the legal arguments available to the [P]arties." *Lewis v. Berryhill*, No. 3:16-CV-1091 (SALM), 2018 WL 1377303, at *9 n.7 (D. Conn. Mar. 19, 2018) (quoting *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013)); *see also United States v. Graham*, 51 F.4th 67, 80 (2d Cir. 2022) (explaining that courts may play only a "'modest initiating role' in shaping the arguments before them" (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020))).

Finally, "[w]hile [the Court] may consider forfeited arguments in [its] discretion to avoid a risk of manifest injustice, 'there is no such risk here.'" *Gazzola v. Hochul*, 88 F.4th 186, 194 n.5 (2d Cir. 2023) (quoting *Katel Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 68 (2d Cir. 2010)). Indeed, as both Parties acknowledge, even if the Court were to reach a resolution on the merits in favor of ML, this would have limited practical impact on the Parties.[13] (*See* MTD, Dkt. 28, at 6, 10 (acknowledging that "even were all pre-petition default interest disallowed," Wilmington would "still hold a deficiency" and no distributions would change); Opp'n, Dkt. 26, at 7 (conceding that "even if this appeal were to successfully eliminate all pre-judgment interest," Wilmington would

[13] Again, the Court makes no decision as to whether this development renders the case moot.

still hold a deficiency).) Accordingly, the Court declines to exercise its discretion and consider ML's forfeited arguments.

* * *

ML's forfeiture of the argument that it defaulted under the Reinstatement Agreement by failing to make timely Monthly Debt Service Payments is fatal to its appeal. Since the Bankruptcy Court rejected ML's Claim Objection on this independent and sufficient basis among three different bases, (*see* 07/23/2025 Hr'g Tr., at 24 (articulating three different defaults of the Reinstatement Agreement)), any consideration of the Bankruptcy Court's other grounds for finding ML in breach of the Reinstatement Agreement would be advisory only. *In re Unitrust Corp.*, 84 B.R. 517, 519–20 (N.D. Ill. 1988) (affirming judgment of bankruptcy court because the appellant waived its challenge to an independent and sufficient basis for the bankruptcy court's ruling).

**CONCLUSION**

For the foregoing reasons, the Court affirms the judgment of the Bankruptcy Court. The Clerk of Court is directed to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 29, 2026
Brooklyn, New York